IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 30, 2007

## CHET ALLEN WALKER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 249700      Don W. Poole, Judge**

---

**No. E2006-01188-CCA-R3-PC - Filed March 14, 2007**

---

Aggrieved of his convictions of first degree premeditated murder, setting fire to personal property, and abuse of a corpse, the petitioner, Chet Allen Walker,[1] sought post-conviction relief, which was denied by the Hamilton County Criminal Court after an evidentiary hearing.  On appeal, the petitioner argues that he received ineffective assistance of counsel because trial counsel failed to call a particular character witness. We affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Brian S. Finlay, Chattanooga, Tennessee, for the Appellant, Chet Allen Walker.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Assistant Attorney General; William H. Cox, III, District Attorney General; and Neal Pinkston, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The defendant was indicted for first degree premeditated murder, setting fire to personal property, and abuse of a corpse.  A jury convicted him of all three offenses, and for the setting-fire-to-personal-property and abuse-of-a-corpse convictions, he received two two-year sentences to run concurrently with a life sentence for the first degree murder conviction.

---

[1]The post-conviction petition and all documents in the post-conviction proceeding list the petitioner's name as "Chet Allen Walker," but the direct appeal opinion lists it as "Chett Allen Walker," *see State v. Chett Allen Walker*, No. E2003-03093-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Oct. 2, 2003).  In this collateral-attack proceeding, the lead process is the post-conviction petition, in which the petitioner signed his name "Chet Walker," and we use that spelling.

The proof at trial showed that, on February 9, 2001, the victim, Joshua Swafford, borrowed a handgun from an acquaintance. *See State v. Chett Allen Walker*, No. E2003-03093-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Oct. 2, 2003). Later that evening, Mr. Swafford and the petitioner drove to a local water tower and shot the gun. *Id.* After shooting, the two men returned to the petitioner's house where they, along with the petitioner's cousin, discussed buying drugs. *Id.* The petitioner told Mr. Swafford that he had $1,700, and Mr. Swafford told him that he could purchase two pounds of marijuana. *Id.* Petitioner's cousin inquired about obtaining "ecstacy," and Mr. Swafford informed them that he could acquire it. *Id.*

The three men traveled to a location where Mr. Swafford bought "ecstacy" for the petitioner's cousin. *Id.* They then traveled to a house in Hixson to purchase marijuana. *Id.* Once they arrived, the petitioner and Mr. Swafford went inside to purchase the drugs with the petitioner's $1,700. *Id.* The two left the house, but Mr. Swafford gave the petitioner neither the drugs nor his money. *Id.* Mr. Swafford drove back to the petitioner's house, and while driving, he placed the borrowed handgun underneath the driver's seat. *Id.* The petitioner, who was sitting in the back seat, picked up the handgun. *Id.*

When they arrived at the petitioner's house, and the petitioner's cousin exited the vehicle, the petitioner moved to the front seat, instructed Mr. Swafford to drive to a certain location, told Mr. Swafford to stop the vehicle, and demanded that his money be returned. *Id.*, slip op. at 2-3. The petitioner shot the handgun through the open window of the car before shooting Mr. Swafford. *Id.* The petitioner then drove the car back to his driveway, sat there for approximately two hours, took gasoline from his four-wheeler, and drove the car behind his house, where he set the car and the victim's body on fire. *Id.*

On February 11, the petitioner directed his mother's boyfriend to the burned vehicle, and the boyfriend called the police. *Id.* The police investigated the scene and interviewed several people, including the petitioner. *Id.* After first accusing his cousin of committing the crime and attempting to help the police gain a confession, the petitioner then confessed in a detailed statement to committing the crime. *Id.*

On direct appeal, this court affirmed all of the petitioner's convictions. *See id.*, slip op. at 13. The petitioner then filed a timely petition for post-conviction relief, which the post-conviction court denied after an evidentiary hearing.[2]

In the post-conviction hearing, the petitioner testified that his trial attorneys did not discuss prior to his trial the possible range of punishment for a first degree murder conviction. He stated that the attorneys told him that his case was not a first degree murder case but a voluntary manslaughter case in which he would receive a sentence of three to six years if convicted.

---

[2]The petitioner raised several issues in his post-conviction petition and amended petition. However, he only raises one issue on appeal: Whether trial counsel was ineffective for not calling a character witness.

The petitioner testified that prior to his trial, television and newspaper media covered the case. He was unsure whether his attorneys moved for a change of venue. The petitioner recalled that his attorneys did question potential jurors concerning pretrial publicity during voir dire. He also testified that his attorneys interviewed several character witnesses, namely Dale Grooms. The petitioner stated that his attorneys should have called character witnesses, particularly Mr. Grooms, because in mounting his voluntary manslaughter defense, he needed to show the jury that he was "a reasonable person [who] just messed up." He asserted that character witnesses were needed to exhibit his reasonableness to the jury, but his attorneys said that "we didn't need them." The petitioner was the only witness who testified at trial.

The petitioner read a statement in which he reiterated the need for character witnesses to show that he was a nonviolent person. He also stated that his criminal record only shows a driving without a license charge. The petitioner further expressed sorrow for what he had done.

On cross-examination, the petitioner testified that his attorneys informed him of the possible sentence once the jury reported its verdicts. He testified that the State never offered him a plea and that he did confess to shooting the handgun out the window, murdering the victim, and setting the fire. Furthermore, he stated that his attorneys discussed his right to testify, reviewed discovery, and explained the voluntary manslaughter defense.

Dale Grooms testified for the petitioner in the post-conviction hearing that he had known the petitioner for approximately 12 to 14 years. He testified that he had worked with the petitioner at Bott Construction and that he took the petitioner "under [his] wing . . . in a roundabout way." As to the petitioner's character, Mr. Grooms testified that the petitioner "was just somebody striving to better himself," that "[he was] a giver, not a taker," and that "he [was] a follower, not a leader." Mr. Grooms further testified that the petitioner seldom raised his voice to him. He also testified that he had spoken to the petitioner's trial attorneys approximately five or six times and had made it clear to them that he was available and willing to testify at trial.

The State called lead counsel, and he testified that he had handled more than 100 first degree murder cases in his 20-year criminal law career. He testified that the petitioner's mother and Mr. Grooms visited him at his office approximately 20 times, and they discussed the petitioner's defense. Lead counsel also testified that he visited the petitioner numerous times in jail and that the petitioner was "very emotional about the situation." He testified that he undertook an "open discovery process" and that he produced copies of all case materials to the petitioner.

Lead counsel testified that he also discussed the voluntary manslaughter defense and the punishment for first degree murder with the petitioner. He explained that strategically they decided that this defense "seemed . . . to be the best possible light that the facts could support" and that denying guilt would enrage the jury. Lead counsel testified that a self-defense claim was not asserted because the only weapon involved was the handgun used by the petitioner.

Lead counsel testified that he had several "professional discussion[s]" with the State regarding a plea offer, but the State never actually made an offer because of the strong proof. Regarding the proof, lead counsel testified that "it was probably the strongest proof [that he had] seen in a first degree murder prosecution." That said, he testified that he and co-counsel aggressively litigated the suppression of the petitioner's confession because it "was [the petitioner's] strongest issue," but the trial court overruled their motion and admitted the confession.

Lead counsel also testified that in preparing for trial, he interviewed several potential witnesses, including Mr. Grooms. However, given the nature of the petitioner's confession, he thought that the petitioner "would make his best witness: He was the only one who could explain to the jury his situation." Furthermore, lead counsel explained that the petitioner's testimony was very emotional, and he did not want to engender prosecution proof about the time that the killing took place and the petitioner's extensive drug use on the night of the murder, preferring not to detract from "the progress [that the petitioner] had made testifying." Lead counsel felt the petitioner's "emotional impact outweighed any progress that somebody could testify as a character witness, given what they would also have to say." In addition, lead counsel was worried that Mr. Grooms, who was "a very honest and direct person," would testify to the petitioner's heavy drug use during that time period. Lead counsel explained that in his experience with voluntary manslaughter cases, juries did not look favorably upon defendants who voluntarily used drugs. Finally, he testified that the "skilled prosecutors" could bring out harmful details contained in the petitioner's confession when cross-examining character witnesses.

On cross-examination, lead counsel testified that he was personally aware of the case's pretrial publicity. He decided not to move for a change of venue because, in his opinion, he would have to "work[] uphill, as a defense attorney, unless the people [had] actually formed an opinion." He testified that changes of venue told the new venue that "this man is so guilty [that he] can't get a fair trial . . . in [his] home community." Lead counsel also testified that he did not recall asking Mr. Grooms specifically about the petitioner's drug use, but in his opinion, he assumed that Mr. Grooms knew. He testified that he normally has character witnesses available and decides whether to call them depending on how the proof at trial develops.

The post-conviction court denied post-conviction relief based on the petitioner's claims of ineffective assistance of counsel. The court found that the petitioner conceded that lead counsel questioned potential jurors during voir dire concerning pretrial publicity and that no jurors were aware of the publicity. Therefore, the court held that the petitioner failed to show prejudice.

Regarding the petitioner's claim that trial counsel was ineffective for failing to inform him of a first degree murder conviction's possible punishment, the court found that lead counsel met with the petitioner and his family and discussed his right to testify and theory of defense. The court also noted that the State did not make a plea offer. The post-conviction court then ruled "that any deficiency in counsel's performance in this respect was not prejudicial."

The court also found that lead counsel had interviewed and met with Mr. Grooms, the only potential witness identified by the petitioner, several times before trial. The court further found that any character evidence could have potentially engendered evidence of the petitioner's voluntary drug use and that lead counsel thought this evidence would diminish the impact of the petitioner's emotional testimony. The post-conviction court stated that Mr. Grooms's testimony would not have been entirely favorable and that the petitioner's testimony supported the theory of defense. Thus, the court found no clear and convincing evidence of deficient performance.

Regarding the voluntary manslaughter theory of defense, the post-conviction court found that the motion to suppress the petitioner's statement was denied and that if the petitioner denied murdering the victim, then the jury could become enraged. The court found that no evidence existed to support a different theory; therefore, counsel was not deficient.

On appeal, the only argument the petitioner raises is that trial counsel was ineffective for not calling Mr. Grooms as a character witness. Because the post-conviction court's denial of relief is supported in the record, we affirm that court's judgment.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

The Sixth Amendment of the United States Constitution and article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). "Claims of ineffective assistance of counsel are considered mixed questions of law and fact and are subject to de novo review." *Serrano v. State*, 133 S.W.3d 599, 603 (Tenn. 2004); *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When a defendant claims ineffective assistance of counsel, the court must determine (1) whether counsel's performance was within the range of competence demanded of attorneys in criminal cases, *Baxter*, 523 S.W.2d at 936, and (2) whether any deficient performance prejudiced the petitioner, *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984); *see also Powers v. State*, 942 S.W.2d 551, 557 (Tenn. Crim. App. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley*, 960 S.W.2d at 580.

A reviewing court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070. This court should not second-guess informed tactical and strategic decisions by defense counsel. *Henley v. State*, 960 S.W.2d at 579. It must evaluate counsel's performance from counsel's

perspective at the time of the alleged error and in light of the totality of the evidence. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2070.

However, this court's deference to counsel's tactical decisions will depend upon counsel's adequate investigation of defense options. *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Assuming adequate investigation, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. *Jerry Whiteside Dickerson v. State*, No. 03C01-9710-CR-00472 (Tenn. Crim. App., Knoxville, Sept. 16, 1998); *Thompson v. State*, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). To show prejudice, the petitioner must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.

Furthermore, "[w]hen a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Generally, presenting such witnesses in the post-conviction hearing is the only way a petitioner can establish that "the failure to discover or interview a witness inured to his prejudice . . . or . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. Accordingly, a petitioner who establishes that trial counsel deficiently performed in failing to investigate or call witnesses is entitled to no relief "unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id*. at 757-58.

Our analysis of the issue on appeal need not be protracted because the record supports the post-conviction court's determination that the petitioner failed to show ineffective assistance of counsel by clear and convincing evidence. Mr. Grooms did testify at the post-conviction hearing as to the petitioner's character. Although Mr. Grooms testified, in essence, that he had not observed the petitioner being violent or unreasonable in the time that he had known him, the petitioner's claim that counsel was ineffective for failing to utilize this testimony was dissipated by counsel's testimony that a strategy of putting the defendant's character in issue would have been harmful to the petitioner's defense.

Lead counsel testified that Mr. Grooms's testimony would subject the petitioner to character attacks and diminish his emotional testimony, potentially defeating the voluntary manslaughter defense. *See* Tenn. R. Evid. 404(a)(1) (as an exception to general rule of exclusion of bad character evidence that shows action in conformity with the character or trait, evidence of a character trait may be offered by the prosecution to rebut a criminal-case defendant's evidence of

good character).  We will not second-guess this informed strategic decision, and we hold that the trial court did not err in concluding that ineffective assistance of counsel was not shown.  *See Archie L. Miller v. State*, No. E2004-01134-CCA-R3-PC, slip op. at 4 (Tenn. Crim. App., Knoxville, June 28, 2005) (holding counsel was not ineffective for failing to call character witnesses for fear that evidence of the defendant's drug trade involvement would come to light).

Following our review, we affirm the order of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE